















RXC   1/22/02   15:34

3:02-CV-00142   GABLE V. XO COMMUNICATIONS

*1*

*CMP.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

'02 JAN 22 PM 2:39

| | |
|---|---|
| TRACY GABLE, On Behalf of Himself and the General Public, | Civil Action No. |
| Plaintiff, | '02 CV 0C 142 IEG (RBB) |
| vs. | FEDERAL SECURITIES <u>CLASS ACTION COMPLAINT</u> |
| XO COMMUNICATIONS, INC.; DANIEL F. AKERSON; NATHANIEL A. DAVIS; and CRAIG O. MCCAW and DOES 1-50, inclusive, | <u>Jury Trial Demanded</u> |
| Defendants. | |

Plaintiff, through his attorneys, brings this action on behalf of himself and all others similarly situated, and on personal knowledge as to himself and his activities, and on information and belief as to all other matters, based on investigation conducted by counsel, hereby alleges as follows:

## I.

## <u>NATURE OF ACTION</u>

1.      This is a class action on behalf of all purchasers of the securities of XO Communications, Inc. ("XO" or "NextLink" or the "Company") between April 4, 2001 and November 29, 2001, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Defendants include: XO; Daniel F. Akerson ("Akerson"), XO's Chief Executive Officer and Chairman of the Board of Directors; Nathaniel A. Davis ("Davis"), President, Chief Operating Officer and a Director; and the Company's founder, controlling shareholder, and director, Craig O. McCaw ("McCaw").



2.      During the Class Period, Defendants issued a series of false and misleading statements concerning the Company's financial condition and cash reserves. In particular, Defendants Akerson and Davis mislead the investing public concerning the ability of the Company to survive until it would be cash flow positive.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and §27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §78aa).

## II.

## JURISDICTION AND VENUE

4.      This action arises under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

5.      Jurisdiction is conferred upon this Court by §22 of the Securities Act, 15 U.S.C. §77v.

6.      Venue is proper in this district pursuant to §27 of the Exchange Act and 28 U.S.C. 1391(b) because the acts charged herein, including the dissemination of materially false and misleading information, occurred in this district. Furthermore, the predominance of XO operations are in California (with offices in California far exceeding other venues), including XO offices in San Francisco, San Mateo, Fremont, Los Angeles, Sacramento and San Diego. In addition, XO maintains multiple IP Nodes throughout California, more than in any other location.

7.      In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of the national securities exchanges.

CLASS ACTION COMPLAINT
GABLE v. XO COMMUNICATIONS, ET AL.              2

## III.

## THE PARTIES

8.     Plaintiff Tracy Gable purchased XO publicly traded securities as detailed in the attached certification and was damaged thereby.

9.     Defendant XO is one of the world's leading providers of broadband communications services offering local and long distance voice communication services, Digital Subscriber Line (DSL) access, Web hosting and e-commerce service, Virtual Private Networks (VPNs), dedicated access, global transit and application infrastructure services for delivering applications over the Internet. In the United States, XO has more than 700,000 metro and intercity fiber miles in operation. The Company is also North America's largest holder of fixed broadband wireless spectrum, with licenses covering 95 percent of the population of the 30 largest U.S. cities and a partnership with licenses covering all of the top cities in Canada.

10.     Defendant Akerson, is and at all relevant times was, XO's Chief Executive Officer and Chairman of the Board of Directors.

11.     Defendant Davis, is and at all relevant times was, XO's President, Chief Operating Officer and a Director

12.     Defendant McCaw is a founder of the Company, the controlling shareholder, and a director.

13.     As officers, directors and/or controlling persons of a Company whose common stock is traded on NASDAQ and governed by the provisions of the federal securities laws, Akerson, Davis and McCaw had a duty to disseminate truthful information promptly and accurately with respect to the Company's operations, products, markets, management, earnings and business prospects, to

correct any previously issued statements that had become materially misleading or untrue, and to disclose any trends that would materially affect earnings and the financial results of XO, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

14.    Under rules and regulations promulgated by the SEC under the Exchange Act, Akerson, Davis and McCaw *inter alia* also had a duty to report all trends, demands or uncertainties that were likely to influence: (a) XO's liquidity; (b) XO's net sales, revenues and/or income; and (c) previously reported financial information such that it would not be indicative of operating results. XO, Akerson, Davis and McCaw's representations during the Class Period violated these specific requirements and obligations.

15.    Akerson, Davis and McCaw, because of their positions with the Company, controlled and/or possessed the power and authority to control the contents of XO's reports, press releases and presentations to the public, which information was conveyed to the investing public. Akerson, Davis and McCaw were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

16.    Akerson, Davis, and McCaw are also liable as individual participants in a fraudulent scheme and course of conduct that operated as a fraud and/or deceit upon the class. Because of their managerial and directorial positions with the Company, Akerson, Davis and McCaw had access to the adverse, non-public information about the business, finances and future business prospects of XO as particularized herein and acted to misrepresent, misstate or conceal such information from Plaintiff and the investing public.

IV.

## BACKGROUND TO THE CLASS PERIOD

17.     XO is a Delaware corporation, which, through its predecessor entities, was formed in

1994. The Company was originally organized as NEXTLINK Communications, LLC, a Washington

limited liability company.  In January 1997, NEXTLINK Communications, LLC merged into

NEXTLINK Communications, Inc., a Washington corporation, which in June 1998 reincorporated

in Delaware under the same name. On June 16, 2000, in connection with the Company's merger with

Concentric Network Corporation, NEXTLINK Communications, Inc. merged with the Company and

the Company, as the surviving corporation in the merger, changed its name to NEXTLINK

Communications, Inc.   On September 25, 2000, the Company began doing business as "XO

Communications" and, on October 25, 2000, the Company formally changed its name to XO

Communications, Inc.

18.     By late 1999, the "dot-com" market had begun to rapidly cool. Internet companies

which recently dominated the new economy, were now of increasingly questionable economic

viability. The demand for Internet-based public offerings had all but vanished and dot-coms across

sectors were downsizing.

19.     With the fall of the dot-com companies, telecommunications companies were faced

with a tightening of credit.  Those companies that were in the process of completing their nationwide

networks, such as XO, were hard hit by this credit crunch.  At the time of the credit crunch, XO had

already received almost $5 billion from investors.  However, more money was needed for XO to

complete its network.

20.     The credit crunch beat down XO's stock price.  In the year 2000, XO had traded over $60 per share.  By 2001, XO was trading in the mid twenties.

21.     During the winter and early spring of 2001, the credit crunch took hold.  By the end of February, XO was trading at less than $15 per share.  By March 31, 2001, XO closed at $5.21 per share.

22.     On April 3, 2001, UBS Warburg PaineWebber downgraded XO to a "hold" from a "strong buy."  XO shares plunged, losing more than 43 percent of their market value, closing at $2.97 a share.

V.

**FALSE AND MISLEADING STATEMENTS
DURING THE CLASS PERIOD**

23.     To reverse its stock's downward slide, XO issued the following press release on April 4, 2001.   The  April  4,  2001  Press  Release  was  also  posted  on  XO's  web  site  at http://www.xo.com/news/62.html:

> **XO Communications Issues Statement on Stock Price and Funding Position**
>
> RESTON, VA - XO Communications, Inc. (Nasdaq: XOXO), one of the world's fastest-growing providers of broadband communications solutions, said today that it believes that misperceived concerns regarding the company's funding position and access to cash have contributed to recent volatility in its stock price.
>
> The company reiterated today that it continues to maintain a strong financial position with an ability to fund its operations into the first half of 2002.  As of December 31, 2000, XO had approximately $3 billion in cash on-hand, including the $517 million of cash that was raised from its subordinated convertible notes offering in January of this year, and cash available under its senior secured credit facility. Availability of these funds is unconditional.

We believe that we have both the existing cash and future funding flexibility to weather the carnage that the telecommunications industry is now experiencing in the market," said XO Chairman and Chief Executive Officer Dan Akerson. "Ironically, for those who survive, the opportunity may be greater than ever before. In our view, the long-term prospects for broadband service revenue growth remain bright and market forces are now dictating that there will be far fewer companies who will pursue the opportunity. We continue to believe that companies such as XO that own facilities, offer differentiated broadband services and continue to execute their business plan will not only survive, but will thrive in the future."

XO is also actively working the company's business model with the dual objectives of reducing the remaining long-term funding gap and extending the point at which the company would be required to access the capital markets. These options are being evaluated within the context of maintaining XO's overarching customer-premises-to-customer-premises broadband strategy. The company plans to provide more details on these initiatives in the near term.

24. The statements made in the April 4, 2001 Press Release were false and misleading for the following reasons:

A. XO did not have the existing cash and future funding flexibility to "weather the carnage" that the telecommunications industry was then experiencing in the market. XO's $5 billion in debt was crushing the Company, and more credit would only be available, if at all, at rates the Company would be unwilling to pay.

B. The Company did not have a "strong financial position" and did not have the "ability to fund its operations into the first half of 2002." XO was insolvent, with no hope of funding its future operations. Even after a $250 million cash infusion and a savings of $2 billion dollars by slowing growth, the Company did not survive to see December of 2001, never mind the end of 2001.

C.      The credit crunch put XO in an untenable position.  XO needed more

funds to complete its network.  It needed to complete its network in order to increase

its revenue and pay back its debt.  At the time, XO was unable to obtain the funds

needed to complete its network, so it would never get the increased revenue a

completed network would bring, making XO unable to pay back its debt.

D.      The Company did not believe that "misperceived concerns" regarding

the Company's funding position and access to cash contributed to recent volatility in

its stock price.  Instead, it was the truth about the Company's precarious financial

position that had caused the Company's stock price to plunge.

25.     The April 4, 2001 Press Release had the desired effect of reversing XO's stock slide.

On April 5, 2001, XO stock rebounded to close at $4.23, an increase of 52% from prior day's close.

26.     On April 9, 2001 The New York Times printed an article entitled *Market Place; How*

*to Salvage Two Companies Buried in Debt*, by Barnaby Feder and Geraldine Fabrikant.  The article

referred to two companies started by Defendant McCaw and stated in relevant part that:

> XO is on course to run out of cash within a year, and investors are
> nervously wondering what steps, if any, Mr. McCaw plans to support
> it.  Mr. McCaw bought 29,500 shares at $17.48 a share early this year,
> according to a recent filing with the Securities and Exchange
> Commission, but a purchase of outstanding shares is not the kind of
> endorsement the investors have in mind.  XO's own projections, which
> may now be too optimistic, suggest a need for roughly $2.5 billion in
> new loans or equity to carry into 2005, the year it expects to start
> breaking even.
>
> Responding to the anxiety, XO issued a statement late Wednesday
> attempting to reassure investors.  Daniel Akerson, the company's
> chairman and chief executive, said that the company had $3 billion in
> cash available.  That was enough, he said, to allow XO to "weather the
> carnage that the telecommunications industry is now experiencing."

XO said it expected to be able to raise money in the future and to take advantage of the opportunities created by the current industry shakeout.

It seems unlikely, though that there will be a major infusion of cash from Mr. McCaw and his partners anytime soon.  "It's not Craig's approach to just throw money at things," said Dennis Weibling, president of Eagle River, Mr. McCaw's investment holding company. "There is a lot you can do to adjust the burn rate."  Mr. McCaw is actively involved in Mr. Akerson's effort to revise XO's business plans to reduce the financing gap and delay the day it needs more cash, according to Robert Ratliffe, Mr. McCaw's spokesman.

27.     On April 19, 2001 The Washington Post, in an article entitled *XO Struggles to Regain Faith and Funding From Wall Street*, by Yuki Noguchi, reiterated XO's funding crunch by stating in relevant part that:

In the past few weeks, such investment firms as Morgan Stanley Dean Witter, Lehman Brothers, Dain Rauscher Wessels, Prudential Securities and UBS Warburg have slashed their ratings or target prices on XO's stock.  Yesterday, bond-rating firm Moody's confirmed it changed its outlook on XO's senior unsecured debt to negative from stable.

Even though XO has $3 billion in cash in its coffers, Wall Street is casting a critical eye on the company's aggressive network expansion plans, which includes plans to spend $1.9 billion this year in the United States and Europe.  XO - which raised $517 million in high-yield debt in January - needs to raise $3 billion more to complete its network, which now spans 60 U.S. markets.

"Obviously, in the environment today, the main issue with us is the funding gap," said Todd Wolfenbarger, a spokesman for XO.

Analysts speculate that XO, which has $4 billion in debt, will scale back its overall capital spending by as much as $1.2 billion and extend its funding beyond midyear next year.  Also, the New York Times reported yesterday that private investment outfit Forstmann Little & Co. is considering investing several hundred million dollars in XO.

> "They're certainly under a lot of pressure right now," said Daniel Ernst,
> an analyst with Legg Mason Wood Walker. "The big difference
> [between XO and WinStar, that recently declared bankruptcy] is that
> XO was sitting on a lounge chair when the music stopped," he said.
> "With $3 billion in cash, they have a lot more flexibility" to scale back
> and adjust to difficult markets, he said.

28.     On April 26, 2001, in a press release circulated over the Business Wire, XO announced

disappointing earnings. To allay investor concerns and slow the degradation of its stock price, XO

announced a spending slowdown and "that it has secured an additional $250 million equity

investment from Forstmann Little." The release also stated that:

> XO estimates that with the changes to its business plan, the proceeds
> of the new Forstmann Little investment, together with the cash on
> hand and committed financing, will be sufficient to fund XO well into
> the first half of 2003.

The release also quoted Theodore J. Forstmann, a senior partner at Forstmann Little, as stating:

> [w]e believe the steps announced today are an appropriate response to
> current capital market conditions and greatly strengthen the Company's
> financial position. The Company will not need any additional funding
> for at least two years; and, assuming the successful implementation of
> their business plan, we regard that need as modest in size, addressable
> through a number of options and not a current concern.

This was confirmed by Akerson, who stated:

> [w]ith the equity investment by Forstmann Little and our capital
> expenditure reduction efforts, we have resolved our capital needs well
> into the first half of 2003 and addressed the market's concerns over
> XO's funding gap[.] We intend to continue to execute our business
> plan and we believe these actions will ensure XO's long-term success.

29.     The statements made in the April 26, 2001 press release were false and misleading

because when made because Defendants knew, or should have known:

CLASS ACTION COMPLAINT
GABLE v. XO COMMUNICATIONS, ET AL.          10

A.    XO did not have the existing cash and funding to survive 2001, never mind sufficient funds to survive "well into the first half of 2003." XO's $5 billion in debt was crushing the Company, and more credit would only be available, if at all, at rates the Company would be unwilling to pay.

B.    The Company had not resolved its capital needs well into 2003. The Company's interest payments were crushing the Company. Even with a $250 million cash infusion and a savings of $2 billion dollars by slowing growth, the Company still would not survive to see the end of 2001.

C.    The credit crunch put XO in an untenable position. XO needed more funds to complete its network. It needed its network to be completed to increase its revenue to fund its debt. However, like other companies, it was unable to obtain the funds needed to complete its network, so it would never be able to repay its debt.

D.    The only reason Forstmann Little was putting money into the Company was that it knew no other funding was forthcoming, and if it did not contribute an additional $250 million, Forstmann Little would lose its entire investment of over $1.25 billion in convertible preferred shares that had been purchased in 2000 when the stock was trading in the mid-$20's. Forstmann Little was buying time in throwing good money after bad. In exchange for the cash infusion, the Company would also issue 50 million new shares of stock, diluting existing shareholders' stake by more than 13 percent. In addition, the $250 million investment reduced the conversion price of Forstmann Little's convertible preferred shares, resulting in a purported $81 million benefit to Forstmann Little.

30.    XO's announced financial cutbacks and the cash infusion were greeted as positive news for the Company.  On April 27, 2001, The Washington Post, in an article titled *XO Reins In Expansion Plans After Loss but Gets Infusion* reported that `[t]hey did the prudent and expected thing, and the magnitude of the reduction was in line with what we were expecting," said Jonathan Atkin, an analyst with Dain Rauscher Wessels.  "They have plenty of time for the markets to shift," he said, "so raising money is no longer a priority for XO".

31.    As reported in the May 4, 2001 edition of The Washington Business Journal, in an article entitled *XO Strikes Funding Deal, But Just Who Benefits?*

> XO Communications recently reported what - on its face sounded like good news. The Reston-based telecom company announced it will cut spending by $2 billion over the next five years, and it will receive an additional $250 million in funding from New York investment firm Forstmann Little.

Company spokesman Todd Wolfenbarger stated "[W]e think it is the right thing to do for the company's long term stability and for current shareholders," adding that "there are certain gives and takes that come with that."  The new investment - combined with the cuts in spending - will provide funding until the first half of 2003, according to XO, which also estimates it will need an additional $1 billion to fund its operations over the next five years.  This figure does not include the most recent Forstmann investment, Wolfenbarger says, because it isn't scheduled to close until the end of the quarter.  The company expects to achieve positive cash flow some time in 2006 and "XO does not need any additional money for the next two years[.]"

32.    In the June 4, 2001 edition of Telephony, written by Kevin Fitchard, Defendant Davis spoke of the recent cutbacks and their effect on XO's survival.  Davis was quoted as saying, "[w]e needed to be in a position where we'd have enough money to fund our plan through 2003.  We raised

$750 million in the toughest of markets. We did that in just nine months." The article went on to say that, "[a]ccording to XO's calculations, the company has to raise an additional $750 million before mid-2003 to put it in the clear until 2005."

33.     The information in this article was false and misleading when made because Defendants knew, or should have known that:

A.      XO did not have the existing cash and funding to survive 2001, never mind "have enough money to fund our plan through 2003." XO's $5 billion in debt was crushing the Company, and if more credit would only be available, if at all, at rates the Company would be unwilling to pay.

B.      The Company had not resolved its capital needs well into 2003. Even with a $250 million cash infusion and a savings of $2 billion dollars by slowing growth, the Company still would not survive to see the end of 2001.

C.      The credit crunch put XO in an untenable position. XO needed more funds to complete its network. It needed its network to be completed to increase its revenue to fund its debt. However, like other companies, it was unable to obtain the funds needed to complete its network, so it would never be able to repay its debt.

D.      The only reason Forstmann Little was putting money into the Company was that it knew no other funding was forthcoming, and if it did not contribute an additional $250 million, Forstmann Little would lose its entire investment of over $1.25 billion in convertible preferred shares that had been purchased in 2000 when the stock was trading in the mid-$20's. Forstmann Little was buying time in throwing good money after bad. In exchange for the cash infusion, the Company would also issue 50 million new shares of stock, diluting existing

shareholders' stake by more than 13 percent. In addition, the $250 million investment reduced the conversion price of Forstmann Little's convertible preferred shares, resulting in a purported $81 million benefit to Forstmann Little.

34.     On August 6, 2001 Communications Today reported that XO was in the process of repurchasing its prior issued debt at a discount. The article referred to a research note published on August 2, 2001 by Credit Suisse First Boston analyst Mark Kastan that approvingly stated "[w]e view this development as a good first step towards balance sheet restructuring as it could help to moderate the severe level of investor concern regarding XO's leverage position."

35.     The purchase of debt by XO was designed to falsely demonstrate to the investing public that XO had more than enough cash on hand to continue up to 2003.

36.     As reported in the August 13, 2001 edition of The Washington Times, in an article by William Glanz entitled *At XO, a Seasoned Executive Hopes to KO Debt*, Akerson estimated that the $1.8 billion in cash and marketable securities the Company had on hand at the end of June will last into the first half of 2003. He also said XO plans to renew its search for equity in six to twelve months. He stated that XO needed an estimated $750 million more to fund all the Company's capital expenses and operating costs before it is cash-flow positive.

37.     The information in this article was false and misleading when made because Defendants knew, or should have known, that:

A.     By August 13, 2001 XO was well on its way to squandering its cash by purchasing debt. The Debt purchase program had started in July, and by August 13, 2001 it had succeeded in spending over $290 million needed to fund the Company's expansion.

B.      The $1.8 billion would not last till 2003 because of the ongoing debt repurchase plan had already hemorrhaged over $290 million in cash. In addition, every dollar spent on debt repurchase increased the $750 million the Company needed to finance its business plan.

C.      Furthermore, the debt purchase plan would hasten the day that the Company would need to sell more equity to survive. The search for equity financing would be necessary much sooner than in "6 to 12 months" as the Company spent more and more on repurchasing its debt on the open market.

D.      The purchasing of the debt itself was a way for the Company to mislead the investing public, by falsely implying that the Company was so cash rich and unconcerned with obtaining the cash needed to finance its business plan that it was able to purchase its own debt.

38.      On November 09, 2001, in a partial disclosure of the truth, The Washington Post reported that XO's debt had been downgraded the day before by Standard & Poor ("S&P"). S&P suggested the money XO spent to repurchase bonds and stock left the Company with only enough cash to do business into the second half of 2002. The newspaper stated that XO repurchased $547.3 million worth of its senior notes and spent $288.4 million in cash to liquidate $472.6 million of its preferred stock during the quarter. The newspaper also said Defendant Akerson hired investment banking firm Houlihan Lokey Howard & Zukin to attract additional investors or to restructure XO's debt. The Company tried to place some of the blame for the Company's precarious financial position on the September 11 attacks.

39.     In mid-November 2001, rumors began to circulate that the Company was preparing for either restructuring or bankruptcy.

40.     The final blow came on November 29, 2001, when the Company announced agreements with Forstmann Little and Telefonos de Mexico S.A. de C.V. (TELMEX) pursuant to which XO would receive an investment of $400 million from each company, or a total of $800 million, in exchange for new equity.  Forstmann Little and TELMEX would thereafter each own 39 percent of the Company's outstanding equity.  The remaining equity, other than that allocated to the Company's employees, would be held primarily by holders of the Company's senior notes.  Consequently, current holders of the Company's equity securities could reasonably expect to lose substantially all the value of their investment as a result.

41.     NASDAQ halted trading in the Company's stock the same day.

## VI.

## DEFENDANTS' SCIENTER

42.     Akerson, Davis, and McCaw who were senior executives and/or directors of XO, were privy to confidential and proprietary information concerning XO, its operations, finances, financial condition, products and present and future business prospects.  These Defendants knew, or were reckless in not knowing, that the Company would not survive past 2001 without a total restructuring that would result in the eradication of the equity holders' interest in the Company.  Their representation to the public about the ability of the Company to survive, its financial position, and the future need for new investors were knowingly and/or recklessly deceitful and perpetrated a fraud on the Class.

43.     In addition to having actual knowledge of the falsity of their statements, Defendants had the motive and the opportunity to perpetrate the fraudulent scheme and course of business described herein, in order to postpone the collapse of the Company. Defendants needed more cash to complete their business plan, knowing that without added investors, the Company would fail. Defendants hoped to stall for time until the credit crunch had passed.

## VII.

## STATUTORY SAFE HARBOR

44.     The statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the false forward-looking statements pled in this Complaint. None of the forward-looking statements pled herein were sufficiently identified as a "forward-looking statement" when made. Nor did meaningful cautionary statements identifying important factors that could cause actual results to differ materially from that in the forward-looking statements accompany those statements. To the extent that the statutory safe harbor does apply to any forward-looking statements pled, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker actually knew the forward-looking statement was false and the forward-looking statement was authorized and/or approved by an executive officer of XO who actually knew that those statements were false when made.

## VIII.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

45.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired XO common stock from April 4, 2001 and November 29, 2001.

inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, officers and directors of the Company, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

46.     During the Class Period, thousands of shares of common stock of XO were traded on an efficient and developed securities market.  Thousands of brokers nationwide have access to trading information about XO through the system.  Within minutes of any transaction taking place, this system displays the most recent trades and prices.

47.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class.  During the Class Period, XO had over 266 million shares of Class A common stock outstanding and actively traded on the NASDAQ National Market, an efficient market, under the ticker symbol "XOXO."

48.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

49.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests that are adverse or antagonistic to those of the Class.

50.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by many individual Class members may be relatively small, the expense and burden of individual litigation makes it virtually impossible

for the Class members to individually seek redress for the wrongful conduct alleged herein.

51.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

A.     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

B.     Whether Defendants participated in and pursued the common course of conduct complained of herein;

C.     Whether documents, press releases and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented the business condition of XO;

D.     Whether Defendants failed to correct prior statements when subsequent events rendered those prior statements untrue or inaccurate;

E.     Whether Defendants acted willfully or recklessly in misrepresenting and/or omitting to state material facts;

F.     Whether the market price of XO's common stock during the Class Period was artificially inflated due to the misrepresentations and/or non-disclosures complained of herein; and

G.     Whether the members of the Class have sustained damages, and, if so, what is the proper measure thereof.

52.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

A.     Defendants made public misrepresentations or omitted material facts during the Class Period, as alleged herein;

B.     The misrepresentations and/or omissions were material;

C.     XO's common stock was traded in an efficient market;

D.     The misrepresentations and/or omissions allegedly intended to induce reasonable investors to misjudge the value of XO shares; and

E.     Plaintiff and members of the Class acquired their shares between the time Defendants made the misrepresentations and/or omissions and the time the truth was revealed, without knowledge of the falsity of the misrepresentations.

**IX.**

**COUNT I**
**(Violations of Section 10(b) of the Exchange Act and Rule 10-5 Promulgated Thereunder)**

53.     Plaintiff incorporates by reference the above paragraphs as if set forth fully herein.

54.     During the Class Period, Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other class members, as alleged herein; (ii) artificially inflate and maintain the market price of XO; and (iii) cause Plaintiff and other members of the Class to purchase XO securities at inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

55.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud

and deceit upon the purchasers of the Company's stock in an effort to maintain artificially high market prices for XO securities in violation of section 10(b) of the Exchange Act and Rule 10b-5.

56.     The statements made by Defendants during the Class Period were materially false and misleading because at the time they were made, the Company and persons acting as corporate officers knew or recklessly ignored, but failed to disclose, the matters set forth herein.

57.     In ignorance of the artificially high market prices of XO's publicly traded securities, and relying directly on Defendants or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, on the integrity of the regulatory process and the truth of representations made to appropriate agencies throughout the Class Period and/or on the absence of material adverse information that was known to Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired XO securities during the Class Period at artificially high prices and were damaged thereby.

58.     Had Plaintiff and the other members of the Class and the marketplace known of the true financial condition, business prospects and character of leadership of XO which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their XO securities during the Class Period, or would have not done so at the artificially inflated prices which they paid.   Hence, Plaintiff and the Class were damaged by Defendants' violations of Section 10(b) and Rule 10b-5.

X.

## COUNT II
**(Violation of Section 20(a) of the Exchange Act - Against the Individual Defendants)**

59.     Plaintiff incorporates by reference the above paragraphs above as if set forth fully herein. This Count is asserted against Defendants Akerson, Davis and McCaw.

60.     Defendants Akerson, Davis and McCaw all acted as controlling persons of XO within the meaning of Section 20 of the Exchange Act as alleged herein. By reasons of their executive, managerial, and board positions with XO, Defendants possessed all the power and authority to cause the Company to engage in the wrongful conduct complained of herein.

61.     By reasons of the aforementioned wrongful conduct, Defendants Akerson, Davis and McCaw are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with purchasing the Company's securities during the Class period.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

1.     Determining that this action is a proper class action, certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and his counsel as class counsel;

2.     Awarding compensatory damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  January 22, 2002

FINKELSTEIN & KRINSK

By: _____
Jeffrey R. Krinsk, Esq.
501 West Broadway, Suite 1250
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile:  (619) 238-5425

Alfred G. Yates Jr., Esq.
Law Office of Alfred G. Yates, Jr.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Telephone: (412) 391-5164
Facsimile:  (412)471-1033

FINKELSTEIN & KRINSK
501 West Broadway, Suite 1250
San Diego, CA 92101
(619) 238-1333

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

1.   The undersigned has reviewed the complaint and approves its filing.

2.   The undersigned did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in this lawsuit.

3.   The undersigned is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.   The undersigned's transaction(s) of XO Communications, Inc. during the Class Period is/are as follows:

| # of Shares | Transaction Date(s) | Purchase/Sale Price |
|---|---|---|
| *124* | *10-18-01* | *1.72000* |

5.   During the three years prior to the date of this Certificate, the undersigned has sought to serve or served as a representative party for a class in the following actions filed under the federal securities laws:

Gable v. Horizon Pharmacies, et al., USDC (Dallas) Case No. 3-99 CV 1244-L.

6.   The undersigned has sought to serve or served as a representative party for a class in the following actions under the federal securities laws filed subsequent to December 22, 1995:

Gable v. Horizon Pharmacies, et al., USDC (Dallas) Case No. 3-99 CV 1244-L.

7.    The undersigned will not accept any payment for serving as a representative party on behalf of the class beyond the undersigned's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this

_17_ day of ____*JANUARY*____, 2002.

*Tracy Dable*
Signature

_*TRACY GABLE*_
Print Name

JS44
(Rev. 07/89)

CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE SECOND PAGE OF THIS FORM.)

02 JAN 22 PM 2: 42

| I.(a) PLAINTIFFS | DEFENDANTS |
|---|---|
| TRACY GABLE, On Behalf of Himself and the General Public | XO COMMUNICATIONS, INC., DANIEL F. AKERSON, NATHANIEL A. DAVIS, and CRAIG O. MCCAW |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **HOUSTON** (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ___ (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|

DEPUTY

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) Jeffrey R. Krinsk, Esq.   619-238-1333 FINKELSTEIN & KRINSK 501 W. Broadway, Suite 1250 San Diego, CA 92101 | ATTORNEYS (IF KNOWN) **02 CV 00142 IEG (RBB)** |
|---|---|

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PT | DEF | | PT | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated or Principal Place of Business in This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated and Principal Place of Business in Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. CAUSE OF ACTION** (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY).   Action arises under §§10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5)

*15.78 FE*

## V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury-Medical Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 450 Commerce ICC Rates etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 640 RR & Truck | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 650 Airline Regs | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veterans Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 660 Occupational Safety/Health | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities Exchange |
| ☐ 160 Stockholders Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 690 Other | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | **LABOR** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 710 Fair Labor Standards Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 720 Labor/Mgmt. Relations | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 General | ☐ 740 Railway Labor Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 535 Death Penalty | ☐ 790 Other Labor Litigation | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Tort to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | | ☐ 950 Constitutionality of State |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 555 Prisoner Conditions | | | |

## VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removal from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

| VII. REQUESTED IN COMPLAINT: | ☒ CHECK IF THIS IS A CLASS ACTION UNDER f.r.c.p. 23 | DEMAND $ *according to proof* | Check YES only if demanded in complaint JURY DEMAND: ☒ YES ☐ NO |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY (See Instructions): | JUDGE | | Docket Number |
|---|---|---|---|
| DATE   1/22/02 | | SIGNATURE OF ATTORNEY OF RECORD | |

::ODMA\PCDOCS\WORDPERFECT\22816\1 January 24, 2000 (3:10pm)

